LCW

# IN THE UNITED STATES DISTRICT COURT FOR
# THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| TRUSTEES OF THE AUTOMOBILE MECHANICS INDUSTRY WELFARE AND PENSION FUNDS OF THE INTERNATIONAL ASSOCIATION OF MECHINISTS AND AEROSPACE WORKERS AFL-CIO, LOCAL 710, | ) ) ) ) ) ) ) | Civil Action No. 10 CV 7408 |
| Counter-Claimants, | ) ) | Hon. Charles R. Norgle |
| v. | ) ) | |
| DODGE OF NAPERVILLE, INC., | ) ) | |
| Counter-Defendant. | ) ) | |

| | | |
|---|---|---|
| TRUSTEES OF THE AUTOMOBILE MECHANICS INDUSTRY WELFARE AND PENSION FUNDS OF THE INTERNATIONAL ASSOCIATION OF MECHINISTS AND AEROSPACE WORKERS AFL-CIO, LOCAL 710, | ) ) ) ) ) ) ) | Civil Action No. 10 CV 7408 |
| Third-Party Plaintiffs, | ) ) | Hon. Charles R. Norgle |
| v. | ) ) | |
| BURKE AUTOMOTIVE GROUP, | ) ) | |
| Third-Party Defendant. | ) | |

## OPINION AND ORDER

When the Chrysler Group filed for bankruptcy in 2009, the unintended consequences rippled across the country and befell local car dealership owners and their employees. In this case, the Trustees of the Automobile Mechanics Industry Welfare and Pension Funds of the International Association of Machinists and Aerospace Workers AFL-CIO, Local 710 (the "Trustees") are fighting to preserve the welfare and pension benefits promised to their union

members. Before the Court is the Trustees' motion for summary judgment; for the following reasons, it is granted.

## I. BACKGROUND

The entity Dodge of Naperville Inc. owned and operated a Chrysler Group car dealership in Naperville, Illinois. Dodge of Naperville was a subsidiary of Burke Automotive Group (collectively, the "Employer"), which owned a second dealership in Lisle, Illinois. Ed Burke ("Burke") was the President and sole owner of Burke Automotive Group. In September 2005, the Automobile Mechanics Local No. 701, International Association of Machinists and Aerospace Workers, AFL-CIO (the "Union") and Dodge of Naperville executed a collective bargaining agreement ("CBA") and its terms "were in full force and effect from August 1, 2005 to and including July 31, 2009." CBA at 34, Dkt. [65-5]. The terms of the CBA were to "continue from year to year according to its original terms" unless "either party" provided notice to "modify or terminate" at least sixty days before the designated expiration of the CBA. Id. The CBA applied to six mechanics (the "Union mechanics") who worked at Dodge of Naperville. On behalf of its members, the Trustees are authorized to: (1) receive welfare and pension contributions owed under the CBA; (2) manage the Welfare and Pension Funds; and (3) pursue collection of delinquent contributions.

Article 11 of the CBA addressed welfare contributions and required Dodge of Naperville to make weekly contributions to the Welfare Fund at a rate that escalated annually. After August 1, 2008, Dodge of Naperville was required to pay $215.00 "per week for each employee to the Welfare Fund." CBA at 23, Dkt. [65-5]. The CBA also obligated Dodge of Naperville "to sign any Participation Agreement required by the Welfare Fund" as long as the Participation Agreement was not inconsistent with the CBA. Id. at 24. Article 12 of the CBA governed

pension contributions in a fashion similar to Article 11. After August 1, 2008, the CBA required Dodge of Naperville to pay $89.00 "per week for each employee to the Pension Fund." Id. at 25. Like Article 11, Dodge of Naperville had to sign a Participation Agreement with the Pension Fund as well.

Following the terms of Articles 11 and 12, Burke signed separate Participation Agreements with the Pension and Welfare Funds on behalf of Dodge of Naperville on September 22, 2005. The two Participation Agreements are each a single page in length—six paragraphs—and are written verbatim. The Participation Agreements reiterate that Dodge of Naperville must pay contributions as delineated in the CBA. The Participation Agreements incorporate the terms of Trust Agreements that initially formed the Welfare and Pension Funds back in the 1950's, and have been amended since. And, the last substantive paragraph of the Participation Agreements warn that if Dodge of Naperville does not provide the Trustees with a timely termination notice, Dodge of Naperville "shall be bound to the provisions of this Agreement for the period of the next Collective Bargaining Agreement and thereafter until proper notice is given but in no event less than three years unless terminated by the Trustees." Pension Fund Participation Agreement at ¶ 6, Dkt. [65-6]; Welfare Fund Participation Agreement at ¶ 6, Dkt. [65-7]. The Participation Agreements also informed Dodge of Naperville that "[t]he rate at which contributions are to be made during any renewed term shall be set by the Board of Trustees." Id.

As part of the Chrysler Group's bankruptcy reorganization in 2009, Chrysler planned to close roughly twenty-five percent of its dealerships around the nation. Chrysler originally selected Burke Automotive Group's facility in Lisle for closure. In the end, however, Burke convinced the Chrysler Group to permit him to temporarily close his Dodge of Naperville facility

for seventeen months to allow him to remodel the Naperville dealership. Burke promised to resume operations at the Naperville location after the renovations concluded.

Before the Naperville dealership closed, and well in advance of the sixty-day notice deadline, the Union mailed a letter dated April 30, 2009 to an agent of Dodge of Naperville notifying the dealership of its "wishes to terminate the existing labor agreement for the purpose of negotiating the terms of a new labor agreement." The Union's Termination Letter at 1., Ex. 6, Dkt. [66-1]. The letter noted that the CBA did not expire until July 31, 2009. The attorney for Dodge of Naperville responded to the Union by fax, and mail, that Dodge of Naperville also "desire[d]…to terminate [the CBA] on July 31, 2009." The Employer's Termination Letter at 1, Ex. 9, Dkt. [66-1]. There is no evidence in the record that Dodge of Naperville, Burke Automotive Group, Burke, or an agent thereof, sent a termination notice to the Trustees.

On June 20, 2009, Dodge of Naperville shuttered its facility, but offered employment to the six Union mechanics at the Lisle location. However, a major distinction existed between the two facilities; the employees at the Lisle dealership were not members of a union. The Union mechanics' prospective employment at the Lisle facility was conditioned on their ending their Union membership and waiving their Union-negotiated wages and benefits. Two of the six mechanics rejected the offer of employment at the Lisle facility; the other four took the offer and began working at the Lisle facility.

On July 8, 2009, the Union filed a complaint against Dodge of Naperville and Burke Automotive with the National Labor Relations Board (the "Board"), alleging that the relocation of the Union mechanics from Naperville to Lisle violated the National Labor Relations Act (the "NLRA" or the "Act"). On August 2, 2010, the Administrative Law Judge ("ALJ") ruled in favor of the Union. The ALJ found that Dodge of Naperville and Burke Automotive Group "constitute

4

a single employer for the purposes of the Act and are jointly and severally liable for the violations of the Act." ALJ Decision at 25, Dkt. [65-9]. The ALJ also found that the manner in which the Employer relocated the Union mechanics violated Sections 8(a)(1), (3) and (5) of the Act. As a remedy, the ALJ recommended to the Board that the Employer be ordered to "honor the terms of the most recent collective bargaining agreement[,]" negotiate a new contract with the Union, and "make the [Union mechanics] whole for any losses of wages, health insurance benefits, vacation pay, pension benefits, and other benefits they may have incurred as a result of the unilateral changes...." Id. at 26.

On November 17, 2010, Dodge of Naperville and two of the Union mechanics filed a Complaint in federal court against the Trustees seeking injunctive and declaratory relief. The Trustees subsequently filed a Cross-claim against Dodge of Naperville and Burke Automotive Group. Dodge of Naperville then moved to dismiss the Cross-claim. The Court denied Dodge of Naperville's motion and entered a stay pending the final resolution of the ongoing litigation before the Board.

The Board reviewed the ALJ's decision and made technical changes to conform the ALJ's decision to the Board's standard remedial language. The changes required the monetary damages to be paid with interest compounded daily and distinguished the Board's rationale from that of the ALJ. But the Board relied on the ALJ's factual findings, did not change the ALJ's legal conclusions, and ultimately "adopt[ed] the recommended Order of the [ALJ] as modified...." NLRB Decision at 4, Dkt. [65-11]. The Board also ordered the Employer to "remit all payments to health care, pension, and/or other funds, that [the Employer was] required to make under the most recent collective-bargaining agreement with the Union, but which [it] failed to make." Id. at 9.

The Employer appealed the Board's Order and argued before the U.S. Court of Appeals for the D.C. Circuit on May 8, 2015. For reasons explained in the detailed opinion issued on August 4, 2015, the D.C. Circuit found that "all of [the Employer]'s arguments must be rejected" and the court affirmed the Board's Order in its entirety. D.C. Cir. Opinion at 12, Dkt. [65-12], see also Dodge of Naperville, Inc. v. N.L.R.B., 796 F.3d 31, 39 (D.C. Cir. 2015). The U.S. Supreme Court denied *certiorari* on March 21, 2016.

After roundtrip litigation from Chicago to Washington D.C., the parties returned to the proceedings before this Court. On December 4, 2015, the Court lifted the stay. The next week the Trustees filed an Amended Counterclaim against Dodge of Naperville and a Third-Party Complaint against Burke Automotive Group. On February 19, 2016, the parties stipulated that Dodge of Naperville's Complaint filed in November 2010 would be dismissed with prejudice, and only the Trustees' claims against Dodge of Naperville and Burke Automotive Group would remain. The Trustees' remaining claims allege that Dodge of Naperville and Burke Automotive Group are jointly and severally liable for violating Section 515 of the Employee Retirement Income Security Act ("ERISA"), see 29 U.S.C. § 1145, because they failed to pay monthly welfare and pension contributions due under the CBA. The Trustees now move for summary judgment on their claims.

## II. DISCUSSION

### A. Standard of Decision

"Summary judgment is appropriate when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Northfield Ins. Co. v. City of Waukegan, 701 F.3d 1124, 1128 (7th Cir. 2012) (quoting Fed. R. Civ. P. 56(a)); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "A genuine issue of

material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Wells v. Coker, 707 F.3d 756, 760 (7th Cir. 2013) (internal quotation marks and citation omitted). The Court views the evidence and draws all reasonable inferences in the light most favorable to the nonmoving party. Id. The Court does not "assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence." Stokes v. Bd. of Educ. of the City of Chi., 599 F.3d 617, 619 (7th Cir. 2010).

But before the nonmoving party "can benefit from a favorable view of evidence, [it] must first actually place evidence before the courts." Montgomery v. Am. Airlines, Inc., 626 F.3d 382, 389 (7th Cir. 2010). Simply showing that there is "some metaphysical doubt as to the material facts" will not defeat a motion for summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citations omitted); see also Argyropoulos v. City of Alton, 539 F.3d 724, 732 (7th Cir. 2008). And, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Summary judgment is appropriate if the nonmoving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Majors v. Gen. Elec. Co., 714 F.3d 527, 532 (7th Cir. 2013) (quoting Celotex Corp., 477 U.S. at 322).

**B. Motion for Summary Judgment**

The Trustees seek pecuniary recovery from the Employer solely pursuant to ERISA, not the NLRA. Specifically, they contend that the Employer violated Section 515 of ERISA, 29 U.S.C. § 1145, and, therefore, the Employer owes damages according to Section 502, 29 U.S.C.

7

§ 1132. The Trustees seek judgment in the amount of $574,572.67. The amount sought is itemized as: (1) $98,637.00 for pension payments not paid on behalf of the Union mechanics during the period of June 24, 2009 through April 30, 2016; (2) $207,475.00 for welfare payments not paid on behalf of the Union mechanics during the same period; (3) $196,802.66 in interest[1] on the missed payments; (4) $30,611.20 in liquidated damages[2]; and (5) $41,046.81 in attorneys' fees.

Section 515 compels employers "to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement." 29 U.S.C. § 1145. Section 502 allows a multiemployer plan to bring a civil action to seek redress for ERISA violations. See 29 U.S.C. § 1132. In addition to allowing a multiemployer plan to collect past-due contributions, Section 502 imposes extra-contractual penalties on a culpable employer including: (1) interest on the unpaid contributions; (2) the greater of the interest on the unpaid contributions or liquidated damages; (3) reasonable attorney's fees and costs of litigation; and (4) any other legal or equitable remedy that the Court deems necessary. To determine '[w]hether an obligation arises under ERISA [the Court must resolve] two distinct questions: the existence of a contractual relationship covered by the act, and whether a violation occurred." Martin v. Garman, 945 F.2d 1000, 1004 (7th Cir. 1991).

As an initial matter, the Court applies the doctrine of collateral estoppel (also commonly referred to as issue preclusion) to the issues already litigated before the ALJ, the Board, and the D.C. Circuit Court of Appeals. "Collateral estoppel prohibits relitigation of an issue of fact or law when the issue is actually litigated, determined by a final judgment and essential to the

---

[1] According to 29 U.S.C. § 1132(g), "interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed" by federal statute.
[2] Liquidated damages must be calculated based on the provisions of the plan, not to exceed twenty percent of the unpaid contribution amount. See 29 U.S.C. § 1132(g)(2)(C)(ii).

8

judgment of a prior tribunal." Martin, 945 F.2d at 1003; see also New Hampshire v. Maine, 532 U.S. 742, 748-49 (2001) (issue preclusion "refers to the effect of a prior judgment in foreclosing successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, whether or not the issue arises on the same or a different claim"). Here, Dodge of Naperville's and Burke Automotive Group's designation as a single employer was an essential issue of fact actually litigated before the ALJ and affirmed with finality by the D.C. Circuit Court of Appeals. Therefore, Dodge of Naperville and Burke Automotive Group are precluded from arguing here that they are not a single employer. Accordingly, judgment in this case will be entered jointly and severally against Dodge of Naperville and Burke Automotive Group.

However, the ALJ, the Board, and the D.C. Circuit did not examine the nature of the contractual relationship between the Trustees and the Employer, nor what penalty to impose for the breach. Nor should they have, because "the Board could not authorize a remedy under ERISA." Martin, 945 F.2d at 1004. There are differences between the remedies available under the NLRA and ERISA. "Under ERISA [certain plaintiffs] are entitled to attorney's fees, prejudgment interest, and liquidated damages, whereas the scope of relief available in an NLRB proceeding is often a matter of agency discretion." Laborers Health & Welfare Trust Fund For N. California v. Advanced Lightweight Concrete Co., 484 U.S. 539, 552–53 (1988). "Congress added these strict remedies to give employers a strong incentive to honor their contractual obligations to contribute and to facilitate the collection of delinquent accounts." Id. at 547.

There is also a division of judicial labor provided by the NLRA and ERISA. The division tasks federal district courts with interpreting the terms of the litigants' contractual relationship, but it "does not confer jurisdiction on district courts to determine whether an employer's

9

unilateral decision to refuse to make postcontract contributions constitutes a violation of the NLRA." Id. at 549. Rather, resolving violations of the NLRA is the function of the Board. See, e.g., NLRB v. Katz, 369 U.S 736, 748 (1962). Therefore, the Court has jurisdiction only to determine the Employer's obligations under ERISA, and if a violation occurred, the remedy available to the Trustees in this forum is purely economic; it is "limited to the collection of 'promised contributions'" plus statutory damages. Advanced Lightweight Concrete, 484 U.S. at 549.

To defend against summary judgment, the Employer advances four arguments. First, the Employer relies heavily on Advanced Lightweight Concrete to argue that because the CBA has expired, and the parties reached an impasse, the Court is without jurisdiction to decide this case because the postcontract matter must be decided by the Board. But nothing in Advanced Lightweight Concrete stands for the proposition that federal district courts are barred from ruling on an ERISA matter when a related case pursuant to the NLRA proceeds before the Board. As Advanced Lightweight Concrete clarified, legal actions under ERISA are distinct from proceedings governed by the NLRA. See 484 U.S. at 549. In this case, the Trustees "seek recovery solely pursuant to sections 502 and 515 of ERISA, 29 U.S.C. §§ 1132 and 1145, and the terms of the CBA and Participation Agreements." Trustees' Mem. Supp. Mot. Summ. J. at 12, Dkt. [64]. In other words, the Trustees simply seek to recover "promised contributions"; a legal determination that Advanced Lightweight Concrete makes clear is within the jurisdiction of the federal district courts. See 484 U.S. at 547 ("The liability created by § 515 may be enforced by the trustees of a plan by bringing an action in federal district court pursuant to § 502."). Therefore, the Court rejects the Employer's contention that the Court cannot rule because this

10

lawsuit "is within the universe of matters that are best suited for resolution by the NLRB." The Employer's Mem. of Law at 15, Dkt. [67].

Second, the Employer argues that there is "conclusive evidence" that "the CBA was terminated," so "there can be no doubt that the CBA, as of July 31, 2009, was terminated and rendered unenforceable." The Employer's Mem. of Law at 7-8, Dkt. [67]. The Employer again relies on Advanced Lightweight Concrete, this time for the proposition that the CBA is unenforceable. The Employer cites no other legal authority for this argument. The Court finds the Employer's argument misplaced because the Supreme Court in Advanced Lightweight Concrete held only that an ERISA "remedy is limited to the collection of 'promised contributions.'" 484 U.S. at 549. Nothing in the Supreme Court's opinion or in Section 515 limits an employer's promised contributions to those promised in a collective bargaining agreement. To the contrary, Section 515 plainly states that the obligation to make contributions can arise under the "terms of the plan or under the terms of a collectively bargained agreement." 29 U.S.C. § 1145 (emphasis added).

Since the Advanced Lightweight Concrete decision, the Seventh Circuit has clarified in several cases that the absence of a valid collective bargaining agreement does not preclude an employer from incurring financial obligations under ERISA. "In fact, it is not even necessary that a CBA exist for an employer to incur such obligations. A participation agreement is thus one potential source of a contribution obligation." Automobile Mechanics Local 701 Welfare and Pension Funds v. Vanguard Car Rental USA, Inc., 502 F.3d 740, 748 (7th Cir. 2007); see also Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Service Inc., 870 F.2d 1148, 1153 (7th Cir. 1989) (discussing how "nothing in ERISA makes the obligation to contribute depend on the existence of a valid collective bargaining agreement"). Therefore, the

11

Court finds that the Employer's argument that the CBA was terminated does not raise a genuine issue of material fact and does not thwart the Trustees' collection efforts.

Third, the Employer argues that the Participation Agreements are not binding or enforceable because the agreements depend on the CBA for their viability. The Employer cites no legal authority in support of this proposition. Instead, the Employer makes several quick and undeveloped assertions. For example, the Employer asserts that the Participation Agreements lack consideration and that Burke did not intend to be legally bound by the agreements when he signed them. But these assertions are without citation to any evidence in the record. On its own, the Employer's failure to cite any legal authority or to adequately develop its argument undermines the Employer's position. See Weinstein v. Schwartz, 422 F.3d 476, 477 n. 1 (7th Cir. 2005) (failure to cite legal authority and develop an argument constitutes waiver) (internal citations omitted). Legal precedent also contradicts the Employer's position. In Vanguard, the Seventh Circuit reviewed participation agreements that were drafted by the same Trustees present in this case, and those participation agreements nearly matched the language of the Participation Agreements at issue in this case. The Vanguard court decided that as "a matter of ERISA law … [a] participation agreement is thus one potential source of a contribution obligation." Vanguard, 502 F.3d at 748. Given that analogous precedent from this Circuit, the Court finds that the Participation Agreements function independently from the CBA and can legally obligate the Employer to make payments on their own. The Court rejects the Employer's unsupported opinions about the Participation Agreements.

The Employer's fourth and final argument returns to the notion that Advanced Lightweight Concrete prevents the Court from adjudicating this case. The Employer contends that because the CBA terminated on July 31, 2009, and the parties have since reached an

impasse, this case involves postcontract bargaining issues that can only resolved by the Board applying the NLRA. However, this argument relies on the false concept that an ERISA action must rely a valid CBA. Whether the Union and the Employer have in fact reached an impasse is not before the Court—that determination is within the purview of the Board's jurisdiction. As discussed during the consideration of the Employer's first and second arguments, the Trustees may enforce the terms of the Participation Agreements to pursue recovery of promised, but delinquent, welfare and pension contributions.

The Court now returns to the two distinct questions that the Trustees must answer affirmatively to be entitled to judgment in their favor: (1) whether a contractual relationship existed; (2) and whether a violation occurred. See Garman, 945 F.2d at 1004. Both of the Participation Agreements state that: "An Employer desiring to terminate this Agreement must notify the Fund Office sixty (60) days prior to the termination of the existing Collective Bargaining Agreement." Pension Fund Participation Agreement at ¶ 6, Dkt. [65-6]; Welfare Fund Participation Agreement at ¶ 6, Dkt. [65-7]. The Employer does not contend and there is no evidence to show that the Employer notified the "Fund Office." The Employer may have notified the Union of its intent to terminate the CBA, but the Fund Office appears to be a different location than the Union's office[3] and the Participation Agreements are distinct from the CBA. Even if the Employer timely notified the Union, the Court sees no reason, and the Employer makes no argument, that the termination notice sent to the Union should be interpreted as proper termination of the Participation Agreements. Therefore, the Court finds that the Employer has not terminated the Participation Agreements.

---

[3] The parties did not provide the physical address for where the "Fund Office" was located in 2009. However, an internet search shows that the Union's office and the office shared by the Welfare and Pension Funds are two different locations—one is located in Carol Stream, IL and the other is located in Burr Ridge, IL. See http://www.mech701.org/about.html (last visited November 14, 2016)

13

In the event that "the Employer fails to provide timely notice[,] the Employer shall be bound to the provisions of [Participation Agreements] for the period of the next Collective Bargaining Agreement and thereafter until proper notice is given but in no event less than three years unless terminated by the Trustees." Pension Fund Participation Agreement at ¶ 6, Dkt. [65-6]; Welfare Fund Participation Agreement at ¶ 6, Dkt. [65-7]. A new CBA between the Union and the Employer has not been signed; there is no evidence that the Employer provided "proper," much less any, termination notice to the Trustees; and there is no evidence that the Trustees terminated the Participation Agreements. Therefore, the Court finds that the Participation Agreements are still valid, and a contractual relationship exists between the Employer and the Trustees.

The determination that a violation occurred is conspectable. Pursuant to the Participation Agreements, the Employer "agree[d] to make contributions on behalf of eligible employees...." Pension Fund Participation Agreement at ¶ 1, Dkt. [65-6]; Welfare Fund Participation Agreement at ¶ 1, Dkt. [65-7]. The Employer admits that it has not made welfare and pension contributions to the Trustees on behalf the Union mechanics since October 2010. See The Employer's Resp. to the Trustees LR56.1 Statement of Material Facts at ¶ 20, Dkt. [66]. Therefore, the Court finds Dodge of Naperville and Burke Automotive Group in violation of Section 515 of ERISA.

Having decided that Dodge of Naperville and Burke Automotive Group are jointly and severally liable for violating ERISA, the calculation of damages under Section 502 must be determined. To establish the amount of damages, the Trustees' calculation depends on: (1) the CBA; (2) the Participation Agreements; (4) the Trust Agreements; (5) a Rehabilitation Plan provided by the Pension Funds' actuary; (6) a certification from Steven Bukovac, who is the

14

administrator of the Trustees' Welfare and Pension Funds and is responsible, in large part, for calculating the amount of damages sought; (7) and an affidavit from the Trustees' attorney regarding fees.

As explained, the CBA required the Employer to contribute $215 and $89 per workweek, per employee to the Welfare and Pension Funds, respectively. In 2012, the Trustees adopted the Rehabilitation Plan, which changed the contribution rate owed to the Pension Fund from $89 to $104 per workweek, per employee. The Rehabilitation Plan took effect on January 1, 2014, and the pension contribution amount increases annually until December 31, 2024. The contribution amount in 2016, for example, is $155 per workweek, per employee.

The circumstances in this case, i.e., an increase in the contribution rate after the expiration of a CBA, are similar to Vanguard. In Vanguard, the Seventh Circuit reviewed nearly identical terms as contained in the Trustees' Participation Agreements here and decided which contribution rate was due after the expiration of a CBA. 502 F.3d at 749. The Trustees argued that the rate due was the one that they adopted after the CBA had expired. Id. at 742. The employer argued that they only owed the rate agreed to in the expired CBA, which they continued to pay. Id. The Vanguard court held that "until there is a new CBA, the contribution rates must remain at the status quo level, which is to say at the level stipulated in the expired CBA." Id. at 750. The court surmised that "[h]ad the Funds wished to protect themselves against the economic risk of being stuck with below-market contributions during a status quo period, they should have insisted on different terms in the agreement." Id. Here, however, the Trustees argue that there are factual distinctions between this case and Vanguard that warrant ordering damages at the higher contribution rate. The Court agrees.

The Trustees have submitted evidence that the annual actuary report for the Pension Fund found: "As of January 1, 2012, the Plan is in critical status (Red Zone)." Actuarial Valuation Report at 2, Ex. H, Certification of Bukovac at 27, Dkt. [65-8]. Following the law promulgated in the Pension Protection Act of 2006, 26 U.S.C. § 432, the Trustees adopted a Rehabilitation Plan to aid in the financial stability of the Pension Fund. The Trustees were complying with Congressional mandates when they changed the contribution rates. By contrast, the Trustees' decision in Vanguard was unilateral and voluntary. Additionally, the employer in Vanguard did not outright refuse to make contribution payments after the termination of the CBA. 502 F.3d at 749. It continued paying after the CBA expired, but simply objected to paying at an increased rate above what it had previously agreed to. Id. Here, the Employer's conduct has been adjudicated in three forums as unlawful, yet it has continued to maintain its delinquent position by completely withholding payments since October of 2010. It would be absurd to fault the Trustees for following federal law and enter judgment at the expired CBA rate when the Employer continues to withhold payment. Such a decision would reward an employer's choice to indefinitely avoid collective bargaining. Furthermore, in contesting summary judgment, the Employer has neither disputed the calculation amount proposed by the Trustees nor raised Vanguard as a defense. The Court finds that not ordering the Employer to pay the Pension Contributions at the increased rate would be "inconsistent with law" and would defeat Congress' intentions for Section 515 of ERISA. See 29 U.S.C. § 1145. Therefore, the judgment in this case shall be calculated at the rate set forth in the Pension Fund's Rehabilitation Plan.

Finally, as the Trustees suggest, the Court orders Dodge of Naperville and Burke Automotive Group "to remit payroll records sufficient to determine the amount of contributions and resulting liquidated damages and interest owed for the period of May 1, 2016 through the

date of the Judgment." Trustees' Mem. Supp. Mot. Summ. J. at 15, Dkt. [64]. Once the Trustees receive the updated payroll records and calculate the total amount of damages due under 29 U.S.C. § 1132, the Trustees may submit a proposed order to the Court for the entry of Judgment.

### III. CONCLUSION

For the foregoing reasons, the Court hereby determines that Dodge of Naperville and Burke Automotive violated § 515 of ERISA and are jointly and severally liable to the Trustees for damages under § 502(g)(2). After calculating the updated amount of damages that are permitted by § 502(g)(2) and in accord with this Opinion, the Trustees may submit a proposed order to the Court for the entry of Judgment.

ENTER:

_____
CHARLES RONALD NORGLE, Judge
United States District Court

DATE: November 15, 2016